# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | GEORGE M. MAROVICH | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4693 | DATE | 10-17-03 |
| CASE TITLE | Charles E. Boey (IDOC # B-45037) v. Kenneth R. Briley, et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss [23-1] is granted in part and denied in part. Defendant Thomas is dismissed. Defendants shall answer the complaint within thirty days of the date of this order. The clerk is directed to correct the names of defendants on the court's docket, correcting "Jonathen Russell" to "Jonathan Russell," "S. Thompson" to "Sandy Thompson," "Captain Waynescott" to "Robert Wainscott," "Sargent Grant" to "Michael Grant," "Mike Bosolowski" to "Michael Borkowski" and "Med Tech Contonato" to "Robert Cattaneo." Plaintiff's renewed motion for appointment of counsel [29-1] is granted; the court will appoint counsel by separate order. Plaintiff's motion for appointment of counsel [42-1] is denied as moot.

(11) ■ For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 2 0 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 45 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| | courtroom deputy's initials | 03 OCT 17 PM 3:05 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES E. BOEY, Jr., )
)
   Plaintiff, )
)
v. )
) No. 02 C 4693
KENNETH BRILEY, JONATHAN RUSSELL, )
SANDY THOMPSON, ROBERT WAINSCOTT,)
DR. ANDREW TILDEN, MED TECH ) Judge George M. Marovich
TORELLIO, MICHAEL GRANT, MICHAEL )
BORKOWSKI, ROBERT CATTANEO, )
LOU MILLER, DR. KEVIN SMITH, and )
CAPTAIN JOHN DOE, )
)
   Defendants.[1/] )

DOCKETED
OCT 20 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles E. Boey, a prisoner in the custody of the Illinois Department of Corrections (IDOC), filed a *pro se* complaint under 42 U.S.C. § 1983 alleging that defendants inflicted cruel and unusual punishment upon him in violation of the Eighth Amendment while he was incarcerated at Stateville Correctional Center. Defendant Kenneth Briley, the warden of Stateville, joined by defendants Russell, Thompson, Wainscott, Thomas, Grant, Borkowski and Cattaneo, have moved to dismiss the complaint under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted.[2/] For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

---

[1/] The clerk is directed to correct "Jonathen Russell" to "Jonathan Russell," "S. Thompson" to "Sandy Thompson," "Captain Waynescott" to "Robert Wainscott," "Sargent Grant" to "Michael Grant," "Mike Bosolowski" to "Michael Borkowski" and "Med Tech Contonato" to "Robert Cattaneo" to conform to the spellings of the defendants' names given in counsel's appearance. This opinion uses the corrected spellings.

[2/] Two defendant, Drs. Smith and Tilden, have separately answered the complaint. One unknown-named defendant, "Captain John Doe," remains unnamed and two named defendants remain unserved. On September 10, 2002, the U.S. Marshal returned summonses unserved for defendants Lou Miller and "Med Tech Torellio," the USM-25 forms indicating that Miller was deceased and there was no employee named Torellio at Stateville.

45

## ALLEGATIONS OF THE COMPLAINT

Boey alleges that on October 4, 2000, at about 6:30 a.m., he was awakened by a correctional officer bringing breakfast to his cell in the segregation unit at Stateville. He climbed down from his bunk and slipped on the wet floor, hitting his head and neck against the steel desk in his cell. Boey screamed in pain, and the officer delivering breakfast called the correctional captain on duty (whom Boey has sued as "Captain John Doe") and asked that a "med-tech" (medical technician) be sent to Boey's cell.

Two med-techs, defendants Jonathan Russell and Sandy Thompson, came to Boey's cell and asked him what happened and where he hurt. Boey, still lying on the wet floor, told them he couldn't move; he tried to move when they told him to do so, but it caused him severe pain. Captain Doe asked the med-techs what they were going to do. Russell responded, "I'm stepping out [of] the cell," and he and Thompson left. Captain Doe remained in the cell with Boey, who was still lying on the floor. After a few minutes had passed and the med-techs had not returned, Doe exclaimed, "what the hell is taken [sic] them so long!" Doe then locked the cell and left Boey lying on the floor.

About twenty minutes later, Doe and the med-techs returned. They ordered Boey to get up, saying there was nothing wrong with him, and "we can't help you if you don't help yourself." Boey screamed in pain and said he couldn't get up. Continuing to say that Boey was "all right," Russell started to pull Boey to his feet, but finally he put Boey back down on the floor and a stretcher was brought.

The elevator in the segregation unit was too small to accommodate the stretcher, but Russell, together with Thompson and defendant Captain Wainscott, attempted to fit the stretcher into the elevator by tilting the stretcher, causing Boey to slip off and hit his head on the floor of the elevator. Wainscott then suggested taking Boey down the stairs instead, but Russell insisted on using the elevator.

When Boey arrived at the emergency room at the Stateville health care unit, defendant Dr. Andrew Tilden told defendant med-tech Torellio to move Boey from the stretcher to an examination table. After Dr. Tilden had left the room, Torellio told Boey to move himself to the table. When

2

Boey said he couldn't, Torellio took hold of Boey's legs and threw them onto the table. As Boey screamed in pain, Torellio grabbed Boey's injured neck and did the same to Boey's upper body.

Hearing Boey's screams, defendant John Thomas, superintendent of the segregation unit, came into the room and asked Boey what had happened. Boey told him he had slopped on the floor and hit his head and neck on the desktop in his cell. Thomas told Boey, "calm down, I'm the superintendent of I-house segregation and the doctors will take care of you."

Dr. Tilden then examined Boey, pronounced him "OK," and directed that he be taken to the bullpen. Boey, still in pain and feeling dizzy, protested that he was not "OK," but was taken to the bullpen anyway. In the bullpen, Boey blacked out and hit his head on the wall. Other inmates called for help. A med-tech arrived and put an inhalant under Boey's nose, and Boey regained consciousness. Boey was taken back to the health care unit on a stretcher and was admitted.

The next day, October 5, 2000, "while being forced to walk to emergency room for another evaluation," Boey encountered Warden Briley and told him of his injury. Briley asked why the floor of his cell had been flooded; Boey told him his cell floods when it rains because the ceiling leaks and the window can't be closed. Briley asked why, if Boey was injured, he wasn't wearing a neck brace, to which Boey responded, "if I'm not injured, why am I talking to you here in Healthcare?" Briley said, "You'll be all right," and walked away.

Boey was released from the healthcare unit that day and taken back to I-House. He was supposed to have been placed in a different cell, but defendant Sergeant Grant took him from the holding cell and compelled him to return to the same cell in which he had been injured. The next day, October 6, Boey submitted a grievance complaining of the conditions in the cell, and also sent a letter to Superintendent Thomas. Boey received no response and no repairs were made to the cell prior to his release from segregation on October 18, 2000.

On December 7, 2000, Boey suffered another blackout, this time while walking in a tunnel between buildings. Defendant med-tech Michael Borkowski revived Boey with an inhalant. Borkowski began to question Boey, but when he learned Boey's name he broke off abruptly, saying "I heard of you, let's go back to H-House." Even though the officer escorting Boey told Borkowski

that Boey had collapsed and hit his head on the floor, Borkowski "forced [Boey] to walk back to H-House in his discombobulated state." When Boey continued to insist that he was ill, Borkowski said, "I'll place my name in your chart so you can sue me, I like getting days off."

After he had been returned to H-House, Boey again lost consciousness. His cellmate called for help, and defendant med-tech Cattaneo came to Boey's cell. Boey states that Cattaneo knew of Boey's condition but refused to let him see a doctor. When Cattaneo was making his rounds on December 14, 2000, Boey asked why Cattaneo hadn't put him in for sick call. Cattaneo responded that if Boey had seen a doctor in the last two weeks, he couldn't see the doctor. Boey alleges that Stateville's "patients rights" statement instructs inmates to return to sick call if there is no improvement in their condition within 48 to 72 hours.

Boey filed an emergency grievance on December 9, 2000, sending it directly to Warden Briley as permitted by IDOC regulations.[3] In a note dated December 18, 2000, Briley responded that the grievance did not need to be heard on an emergency basis, and directed Boey to resubmit it through his counselor. Correctional counselor Louis Briick (who is not named as a defendant) responded on January 29, 2001, that "no grieveable issue exists. Treatment has been appropriate."

Boey alleges that he continued to request "further evaluation" of his injuries from Dr. Tilden, but gives no specific dates for these requests, nor does he allege that he filed further grievances with respect to them. Boey also does not allege that he suffered additional blackouts.

---

[3] **Emergency Procedures**

> An offender may request a grievance be handled on an emergency basis by forwarding the grievance directly to the Chief Administrative Officer.
>
> a) If the Chief Administrative Officer determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender, the grievance shall be handled on an emergency basis.
>
> b) The Chief Administrative Officer shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken.

20 Ill. Admin. Code § 504.840.

Boey alleges that he was again denied medical care in 2002, this time for chronic back pain, which he alleges resulted from his prior injury. He states that on February 25, 2002, Dr. Kareem Abdulatoff ordered that he receive physical therapy. After fourteen days without treatment, Boey sent an emergency grievance to Warden Briley, who rejected it as a non-emergency. Boey also wrote Stateville Medical Director Kevin Smith and received no response. After 55 days Boey was evaluated by a physical therapist. The therapist told him that he would need at least twelve treatments, but visits to the physical therapist would have to be approved by Smith, and Smith wasn't approving any in order to save money. Boey has received no physical therapy. On May 26, 2002, Boey alleges his pain was so severe that he was taken to the emergency room. Dr. Tilden "gave no evaluation," pronounced him "OK," and sent him back to his cell house. Boey continues to suffer from back pain.

## DISCUSSION

### I. Standard for a Motion to Dismiss

When the court considers a motion to dismiss, a plaintiff's allegations of fact are taken as true and all reasonable inferences are drawn in the plaintiff's favor. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993); *Thompson v. Illinois Dept. of Professional Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). Pro se complaints are to be liberally construed, and a pro se civil rights complaint may only be dismissed if it is beyond doubt that there is no set of facts under which the plaintiff could obtain relief. *McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000).

### II. Principles of Eighth Amendment Liability

An Eighth Amendment claim, whether alleging inhumane conditions of confinement or denial of medical treatment, has two components. First, the deprivation must be objectively severe:

> [E]xtreme deprivations are required to make out a conditions-of- confinement claim. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. A similar analysis applies to medical needs. Because society does not expect

5

that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious.

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992)(internal citations and quotations omitted). Second, the defendant must have a subjectively culpable state of mind. The defendant must have either intentionally inflicted unnecessary suffering or permitted it through deliberate indifference, "know[ing] that inmates face a substantial risk of serious harm and disregard[ing] that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Defendants make essentially three contentions: (a) none of the claimed deprivations was objectively serious enough to violate the Eighth Amendment; (b) assuming Boey suffered any deprivation of constitutional magnitude, defendants Briley and Thomas cannot be liable because they had no knowledge of it and were not personally involved; and (c) Briley and Thomas are entitled to qualified immunity because reasonable officials in their positions would not have known that what they did or failed to do violated Boey's rights.

The first two are valid objections as to portions of Boey's claims, but qualified immunity is irrelevant here. Qualified immunity shields governmental officials performing discretionary functions from claims for money damages under 42 U.S.C. § 1983 unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is "clearly established" if its contours are "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This does not require that the identical claim have been previously decided, only that the state of the law at the time gave the defendant fair warning. *Id.* at 740-41. Defendants do not suggest that there has been any change since 2000 in the interpretation of the Eighth Amendment as applied to the claims Boey raises. A prisoner's right not to be housed under inhumane conditions or denied medical care was as clearly established at the time of the incidents alleged in the complaint as it is today. If Boey's allegations, taken as true, do not amount to a violation of clearly established law, he has simply failed to state a claim.

## III. Conditions in Boey's Cell

Boey alleged that the floor of his cell became wet when it rained because the ceiling leaked and the window could no be closed. It appears from Boey's brief in opposition to defendants' motion that he asserts two separate claims based on these allegations: that the wet floor represented an unreasonable risk to his safety, causing his injury, and that being forced to live with a wet floor, broken window and leaky ceiling amounted to cruel and unusual punishment in itself.

A wet floor does not present a sufficiently substantial risk of serious injury to give rise to Eighth Amendment liability for an accidental fall. A wet floor is a hazard, and a fall can result in serious injury, but people both in and out of prison routinely and successfully cope with wet floors. A defendant's ignoring this kind of risk will support a negligence claim, but ignoring a risk that can be avoided with a bit of additional care on the plaintiff's part is not the sort of "criminal recklessness" required for an Eighth Amendment violation. *See Farmer*, 511 U.S. at 837, 839-40 (equating deliberate indifference with criminal recklessness); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)("deliberate indifference is akin to criminal recklessness").

Even assuming that the wet floor presented a sufficiently substantial risk, a defendant could be liable for Boey's injury on this theory only if he had been aware of the risk, was able to remedy the situation before Boey fell, and failed to do so. Boey alleges that after the accident he informed defendants Briley and Thomas of what happened and filed formal grievances. He does not allege in the complaint that any of the defendants knew of the problem *before* the accident.

In his brief in opposition to defendants' motion, Boey points to a statement by inmate Jerry Sicka, attached as an exhibit to the complaint, stating that Sicka had previously occupied the cell and complained of flooding. Nevertheless, while exhibits are treated as part of the complaint, a statement by Sicka contained in an exhibit cannot be taken as an allegation by Boey.

Nor is it enough for Boey to have belatedly alleged in his brief that Briley and Thomas knew of the water problem. In response to a motion to dismiss, a plaintiff may assert new allegations consistent with the allegations of the complaint to show that he is able to state a claim. *Help at Home, Inc., v. Medical Capital, LLC.*, 260 F.3d 748, 752-53 (7th Cir. 2002). Nevertheless, it is also settled

that a complaint may not be amended by a brief in opposition to a motion to dismiss. *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984).

These rules are not inconsistent. A complaint must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Leatherman*, 507 U.S. at 168 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), even though every relevant fact need not be included. Consequently there is a difference between offering additional allegations to substantiate a claim already outlined in the complaint and adding allegations presenting a new claim, which can only be done by amending the complaint. *See Anzaldua v. Chicago Transit Authority*, No. 02 C 2902, 2002 WL 31557622 (N.D.Ill. 2002) (Kocoras, C.J.); *Herrara v. North & Kimball Group*, No. 01 C 7349, 2002 WL 253019 (N.D.Ill. 2002)(Aspen, C.J.). Boey's complaint did not give defendants Briley and Thomas fair notice of a claim that they were liable for his injury because they knew of a serious risk to Boey's safety and failed to remedy it. Indeed, the reasonable inference from Boey's account of Briley's questioning him in the healthcare unit following his injury is that Briley did *not* know.

Boey's claim that the discomfort of his cell rather than its dangerousness violated the Eighth Amendment stands on a different footing. Boey alleges that after the accident he told Briley and Thomas about conditions in his cell, but was returned to the same cell for thirteen more days before being released from segregation. For that period of time, at least, these defendants can be charged with actual knowledge.

Prison conditions may be harsh and uncomfortable, but prisoners are entitled to adequate shelter. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). Nevertheless, assuming that periodic flooding of a prisoner's cell can amount to a sufficiently severe deprivation, not only the severity of the deprivation but its duration must be considered. *Id.* at 643. The complaint alleges that Boey was subjected to the leaky cell for about two weeks after defendants were told of the problem. This is not long enough for such a deprivation to rise to the level of cruel and unusual punishment. The court accordingly grants defendants' motion with respect to Boey's claim that defendants inflicted cruel and unusual punishment by not repairing his segregation cell or removing him from it after his injury.

8

## IV. Denial of Medical Care

With respect to Boey's claims of denial of medical care, defendants offer generally correct statements of law but make no effort to address Boey's actual allegations. At least with respect to these defendants, Boey is neither complaining that he did not receive "the best care possible," nor "disagree[ing] with the method of treatment." Def. Br. at 7. Boey complains of virtually sadistic treatment in one instance and no treatment at all in others.

Boey alleges that although he complained of a neck injury and could not move without severe pain, Russell tried to force him to his feet. After Boey's screams convinced Russell that Boey would have to be moved on a stretcher, he and Thomas, assisted by Wainscott, tried to angle the stretcher into an elevator that could not accommodate it, causing Boey to fall off. Carelessness or clumsiness does not violate the Eighth Amendment, but the allegations strongly suggest that these defendants saw their task as moving Boey's body with as little effort as possible without regard to the pain, or even additional injury, they might inflict on Boey.

Defendants Cattaneo and Borkowski allegedly refused to take Boey to the health care unit when he lost consciousness. Loss of consciousness qualifies as a "serious medical need," since "even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). It follows that deliberate indifference to that need violates the Eighth Amendment. In both cases, persons who had been with Boey confirmed to the med-tech that he had lost consciousness, and it can reasonably be inferred from the allegations of the complaint that Cattaneo and Borkowski refused to take Boey to see a doctor for reasons unrelated to any professional assessment of Boey's condition. To refuse to let Boey be examined by a physician under these circumstances amounted to deliberate indifference.

There remains the question whether preventing Boey from seeing a physician caused him any actual injury. Deliberate indifference to a risk of serious harm that does not materialize is not an Eighth Amendment violation, even though the inmate suffers the unnecessary apprehension that it might. *See Babcock v. White*, 102 F.3d 267, 271 (7th Cir. 1996)(no liability for failure to respond to prisoner's reasonable fear of assault by other inmates when no assault occurred). Boey may not

9

have been harmed by being left untreated, and there may have been nothing a physician could have done. Nevertheless, this issue was not raised by the motion to dismiss, Boey has had no opportunity to respond, and it is more properly addressed in the context of a motion for summary judgment. Defendants' motion is denied as to defendants Russell, Smith, Wainscott, Cattaneo and Borkowski.

## V. Personal Involvement of Defendants Briley and Thomas

Defendants Briley and Thomas contend that Boey has not stated a claim against them because he is attempting to sue them based solely on their supervisory positions. They deny that they were personally involved in any violation of Boey's constitutional rights, claiming that Boey "never alleges that he advised Defendants Briley or Thomas about any conditions that he is complaining about until after the alleged incident." Def. Br. at 5.

Defendants are correct that liability under § 1983 cannot be based on supervisory responsibility alone, or even negligent supervision; the supervisor must have known about the conduct and facilitated it, condoned it, or recklessly closed his eyes to it. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). The court agrees that Thomas has no liability for the other defendants' alleged denial of medical care. As cell house superintendent, Thomas did not have had authority over medical personnel. His telling Boey, "I'm the superintendent of I-house segregation and the doctors will take care of you," did not make him responsible for monitoring Boey's treatment from then on.

Warden Briley presents a different case. Briley, of course, had no involvement in other defendants' mistreatment of Boey on October 4, 2000. But Briley's subsequent involvement in Boey's medical care was not limited to his casual encounter with Boey in the health care unit on October 5, 2000, as defendants' motion suggests. Although Boey's emergency grievance of December 9, 2000, is mentioned in defendants' statement of facts, Def. Br. at 3, it is entirely ignored in the argument for dismissal based on Briley's supposed lack of personal involvement.

The grievance, Cmplt. Exh. 12, informed Briley that Boey had lost consciousness on December 4, 2000, for the third time since his injury, and feared it would happen again. Boey pleaded that the fact that he had seen a doctor on November 27, 2000, shouldn't prevent his seeing a doctor again.

10

He stated that on "this same day in question," presumably November 27, 2000, he went for an EKG [electrocardiogram], but Boey had understood from what a nurse had told him that he was supposed to receive an EEG [electroencephalogram]. Boey discovered there was no record of his previous blackouts, which med-techs should have documented. Boey stated he had been scheduled for a blood test, but pleaded, "there's nothing wrong with my heart or blood. It's something in my head. This has been an ongoing problem. I really need help!" Boey also sent Briley a letter dated December 9, complaining that his previous injury had not been documented in his medical file.

Briley's response, dated December 18, 2000, stated that the grievance "did not include elements which require it to be heard on an emergency basis." The letter, which was probably a form response, did not state what elements were missing from Boey's grievance. IDOC regulations define an emergency as "a substantial risk of imminent personal injury or other serious or irreparable harm to the offender." 20 Ill. Admin. Code § 504.840(a). Sudden loss of consciousness is both a symptom to be taken seriously and presents a serious risk of injury in itself. A maximum-security prison has walls, floors and stairs of concrete and steel; it is not a safe place to fall down suddenly. Boey had been seen by a physician on November 27, but this had been before his latest blackout, and a med-tech, not a physician, had decided Boey needed no further evaluation or treatment.

Prison administrators necessarily rely on the medical judgment of health care professionals. Liability under § 1983 requires actual knowledge of a serious risk; if a trained professional opines that no risk exists, a layperson normally cannot be held to know that it does. "Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Bond v. Aguinaldo*, 228 F.Supp.2d 918, 920 (N.D.Ill. 2002)(Bucklo, J.)(citations omitted).

Taking Boey's allegations as true and drawing reasonable inferences in his favor, this was such an unusual case, where it should have been apparent that medical judgment had not been exercised. Boey stated that he had lost consciousness, not for the first time, and med-techs had refused his requests to be seen by a physician for reasons unrelated to any medical evaluation. Boey claimed that his blackouts, although witnessed by others, were not being documented in his medical records. Briley

11

did not have to accept Boey's statements as true, but he could have had a subordinate investigate them. According to the complaint, Briley did nothing except tell Boey, more than a week later, to put his grievance back in the hopper for routine processing.

This sufficiently alleges deliberate indifference. A prisoner cannot hold the warden responsible for a subordinate's constitutional violation simply by demanding immediate intervention. Until he or she has evidence to the contrary, a warden can assume that subordinates are properly addressing problems as they arise. Nevertheless, if a warden could always assume that subordinates were handling problems correctly, there would be no need for the emergency grievance procedure -- and little need for the warden. If subordinates have failed to act to remedy a constitutional violation, a warden's knowing failure to intervene amounts to participation in the violation. "[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

Boey's grievance was refiled on January 8, 2001, and rejected on January 29 by Boey's counselor, who stated that Boey had received appropriate treatment. Boey does not allege that he appealed again put the grievance before Briley, or needed to. As in the case of the med-techs' refusal to take Boey to the emergency room for evaluation, it may be that Briley's ignoring Boey's emergency grievance caused him no injury, but, again, defendants failed to raise the issue.

The complaint does not allege any basis for holding Briley responsible for Boey's being denied physical therapy in 2002. Boey states in his brief that after physical therapy had been prescribed on February 25, 2002, he waited 14 days and then filed an emergency grievance, which Briley declined to treat as an emergency. Pl. Br. at 6. This was a reasonable response to a 14-day delay in treating Boey's back pain, and Boey does not allege any further involvement by Briley.

## VI. Official Capacity Claims

Finally, Boey asks for relief against the defendants in both their individual and official capacities. Suits against state officials in their official capacities are effectively suits against the state itself, but states are not "persons" who may be sued under § 1983 for constitutional deprivations and the Eleventh Amendment bars federal suits by individuals against states. *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000). All official-capacity claims are accordingly dismissed.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted as to Boey's claim that failure to prevent his cell from flooding when it rained constituted cruel and unusual punishment in violation of the Eighth Amendment. With respect to Boey's medical-care claims, defendants' motion to dismiss is denied as to defendants Russell, Thompson, Wainscott, Cattaneo and Borkowski. Defendants' motion is granted as to defendant Thomas, and with no claims remaining against him he is dismissed as a defendant. Defendants' motion is granted as to defendant Briley, except with respect to Briley's failure to respond to Boey's emergency grievance in December of 2000. All official-capacity claims are dismissed. Defendants shall answer the complaint within thirty days of the date of this order.

ENTER:

_____
George M. Marovich
United States District Judge

DATED: Oct. 17, 2003